UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| RIO GRANDE ROYALTY COMPANY, INC., on behalf of itself and all others similarly situated, § § § § Plaintiff, § § § ENERGY TRANSFER PARTNERS, L.P., § ENERGY TRANSFER COMPANY, ETC § MARKETING, LTD., and HOUSTON § PIPELINE COMPANY, § § Defendants. § § | No. H-08-cv-0857 |

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion to Dismiss. (Doc. No. 18.) For the following reasons, Defendants' Motion must be granted in part and denied in part.

## I. INTRODUCTION

This case involves Sherman Act claims for unlawful monopolization, attempted monopolization, or unlawful contracts in restraint of trade in the market for fixed-price natural gas baseload transactions at the Houston Shipping Channel ("HSC"). Plaintiff Rio Grande Royalty Company, Inc. is an energy company in Kemah, Texas, that sold natural gas based on the *Inside FERC's Gas Market Report* ("*Inside FERC*") HSC Index during the class period, December 2003 to December 2005.[1] (Compl. ¶ 11.)

Defendants allegedly dumped natural gas in the Relevant Market to drive down the price of gas, reported that depressed price to *Inside FERC*, and intentionally depressed the price to maintain their monopoly in the Relevant Market. (*Id.* at ¶ 2.) Defendant Energy Transfer Partners, L.P. ("ETP") is a publicly traded energy company

---
[1] The facts in the Complaint are taken as true for the purposes of this Order.

1

that processes, transports, and stores natural gas. The company also owns pipelines in West Texas, including the Houston Pipeline Company ("HPL"), an intrastate natural gas pipeline system that serves the HSC natural gas market. (*Id.* at ¶ 12.) Defendants Energy Transfer Company ("ETC") and HPL are subsidiaries of ETP that, among other business interests, buy and sell physical and financial natural gas contracts for ETP, sometimes under the name ETC Marketing, Ltd, also a subsidiary of ETP. (*Id.* at ¶¶ 13-14.)

Employees of Defendant ETC Marketing, Ltd. buy and sell physical natural gas at delivery hubs including HSC, Waha, and Permian, and buy and sell financial natural gas contracts both on and off exchanges including the Intercontinental Exchange ("ICE"). (*Id.* at ¶¶ 15, 23.) The ICE is an electronic trading platform that offers trading in physical natural gas contracts for over 100 natural gas hubs in North America, including HSC. (*Id.* at ¶ 31.) Industry contracts, including those entered into by ETP, for the physical sale or purchase of natural gas at wholesale often have a price term that refers to the *Inside FERC* index price. (Compl. ¶ 35.) Defendants' physical trades were priced using either a fixed price at the time of the transaction or with reference to an index price to be set at a later date. (*Id.* at ¶ 24.)

ETP monopolized the market for fixed-price natural gas by placing "artificially low, non-competitive price offers and bids during bid week" below the level of the HSC-Henry Hub basis.[2] (Compl. ¶¶ 45, 52, 84.) Defendants have a dominant position in the fixed-price natural gas market at HSC because they own three major pipelines and the major storage facility in the HSC market area; Defendants often comprised over 80 percent of the total sales on ICE for the HSC fixed-price natural gas market during the

---

[2] Henry Hub is another natural gas pricing terminal for which prices are reported.

class period.[3] (Compl. ¶¶ 2, 27, 40-43.) At several times during the class period, Defendants sold massive quantities of physical natural gas at low prices at the HSC via bilateral contracts in order to artificially lower prices for HSC natural gas. For example, on September 26-27, 2005, Defendants purchased natural gas from the Waha natural gas hub to sell on the HSC market and, on September 28th, sold massive quantities of gas at the HSC on the ICE, and then reported those transactions to *Inside FERC*. (Compl. ¶¶ 59, 61-63.) Defendants profited from this scheme because they were also a net buyer of natural gas and could purchase gas at prices based on the artificially low index price. (*Id.* ¶¶ 3, 63.) Plaintiffs detail several other incidents during the class period in which Defendants sold natural gas at HSC and reported these sales to *Inside FERC*. (*Id.* at ¶¶ 72-81.)

Plaintiff defines the market for fixed-price natural gas baseload transactions[4] at the HSC as the relevant market for purposes of its claims. (Compl. ¶ 1.) Plaintiff used price indexes, including *Inside FERC* "for various purposes, including the pricing of physical natural gas contracts." (Compl. ¶ 29.) Plaintiff, as a seller of natural gas, was injured by the decreased price because it sold natural gas "at a price derived from the HSC published index." (*Id.* ¶¶ 4, 29-30.) Plaintiff now brings claims under the Clayton Act (15 U.S.C. §§ 15, 26), alleging that Defendants violated Section 1 of the Sherman Act (15 U.S.C. § 1) by entering into contracts in restraint of trade and violated Section 2

---

[3] At one point, Plaintiff contends that Defendant comprised 80 percent of sales during bidweek, the last five business days in a month before the prompt-month begins; in other parts of its Motion, Plaintiff alleges that Defendant comprised 80 percent or more of sales of HSC natural gas on ICE generally. (Pl. Compl. ¶ 33, 38, 42.)

[4] A baseload transaction refers to a natural gas trade that requires the seller to deliver physical natural gas to the buyer at a certain location over the course of the following month.

of the Sherman Act by attempted and actual monopolization (15 U.S.C. § 2). This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. MOTION TO DISMISS

### A. Standard

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6) (2008). When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)). Although the Court generally considers a motion to dismiss for failure to state a claim based on the face of the Complaint, the Court may also take notice of matters of public record. *See Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994).

### B. Analysis

#### 1. Attempted Monopolization Claim, Sherman Act Section 2

To demonstrate attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Surgical Care of Hammond, L.C. v.*

*Hospital Service Dist. No. 1. of Tangipahoa Parish*, 309 F.3d 839, 839 (5th Cir. 2002). Predatory or anticompetitive conduct is conduct that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32, (1985)). *See also Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000). A "dangerous probability" is analyzed by considering the relevant market and the defendant's ability to lessen or destroy competition in that market. *McQuillan*, at 456, 459 (holding that a "dangerous probability" may not be inferred from a specific intent to monopolize). Monopoly power under Section 2 is something greater than the market power sufficient to establish a Section 1 claim. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992).

### Exclusionary Conduct or Predatory Pricing

Defendants contend that Plaintiff fails to allege the requisite illegal exclusionary conduct. They argue that Plaintiff fails to plead that Defendants' prices were below an appropriate measure of cost, therefore failing to state a claim for predatory pricing or any other type of exclusionary conduct prohibited by the Sherman Act. They note that, while Plaintiff does allege that Defendants' sales prices were "artificially low, non-competitive and commercially unreasonable," "below market," "less than competitive," or "below competitive levels" (Pl. Compl. ¶¶ 2, 3, 33, 63, 84, 113), these statements do not adequately state a claim for predatory pricing. Plaintiff responds that it did not state a claim for predatory pricing, but stated a claim based on the lower prices rather than predatory prices.

One manner of pleading exclusionary conduct is predatory pricing. In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, the Supreme Court held that recovery under the Sherman Anti-Trust statutes is not available when the plaintiff alleges above-cost prices that are below general market levels or the costs of a firm's competitors. 509 U.S. 209, 223 (1993). *See also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. at 319. Only below cost prices suffice.[5] *Id.*[6] In order to state a predatory pricing claim, the plaintiff must prove (1) that the prices complained of are below an appropriate measure of its rival's costs and (2) that "the competitor had ... a dangerous probabilit[y] of recouping its investment in below-cost prices." *Brooke Group.*, 509 U.S. at 222, 224; *Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, – S.Ct. –, 2009 WL 454286, at *9 (U.S. Feb. 25, 2009); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 318-19 (2007) (citing *Brooke Group*); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 477 (5th Cir. . 2000).

Here, Plaintiff concedes that it does not state a claim for predatory pricing. The Court has found no precedent allowing a Section 2 claim based on prices that are low but not predatory absent some other indicia of exclusionary conduct intended to drive out the competition. In addition, as explained below in the discussion regarding Plaintiff's claim for monopolization, Plaintiff's market share is unclear given the inconsistencies in

---

[5] This holding does not necessarily extend to cases involving two or more products: in a case involving bundled discounts (for example, selling two items for less than the individual price of each), the Ninth Circuit recently held that the plaintiff does not need to allege straight below-cost pricing. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (holding that, in bundled discount cases, the plaintiff must prove that, when the full amount of the discount is attributed to the competitive product, the resulting price of that product is below the defendant's incremental cost to produce it).

[6] A plaintiff may state a Sherman Act Section 1 claim for lower prices, for example, as a result of a buyers' cartel where a group of buyers sets a price below competitive levels. *See Mandeville Island Farms v. American Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948); *In re Southeastern Milk Antitrust Litigation*, 555 F.Supp.2d 934, 943 (E.D. Tenn. 2008) (holding that the plaintiffs had stated a claim under Section 1 for a conspiracy to set prices); *International Outsourcing Services, LLC v. Blistex, Inc.*, 420 F.Supp.2d 860, (N.D. Ill. 2006). This line of cases is inapplicable to a Section 2 claim.

Plaintiff's complaint. Accordingly, it is not possible, at this time, for the Court to determine if Plaintiff has alleged a dangerous probability of monopolization. Without more, Plaintiff has failed to state a claim.

### 2. Monopolization Claim, Sherman Act Section 2

Defendants contend that Plaintiff does not adequately plead that Defendants possessed monopoly power or a dangerous probability of achieving monopoly power in the relevant market. They contend that the Complaint fails to allege Defendants' share of all sales of fixed-price baseload transactions at HSC; the relative positions of Defendants and their competitors in the market; the existence of barriers to entry; or the durability of Defendants' alleged monopoly power. Plaintiff responds that the best evidence of monopoly power is the ability to control price and that evidence of market share is not needed.

In order to state a claim for actual monopolization, the plaintiff needs to allege that the violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen or historic accident. See *U.S. v. Grinnell*, 384 U.S. 563 (1966); *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). The possession of monopoly power and charging monopoly prices, without more, is not unlawful, and is an important element of the free-market system. See *Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 407 (2004). Monopolistic intent can be inferred from the exclusionary conduct of a firm with monopoly power. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d at 893. "A distinction is often drawn between market power—

some degree of power to affect price by increasing or reducing output—and monopoly power—the power to set a price significantly above the competitive level and to sustain such a price for a substantial period of time." *See* SULLIVAN & GRIMES, THE LAW OF ANTITRUST: AN INTEGRATED HANDBOOK 98 (2006). *See also Dimmit Agri Industries, Inc. v. CPC Intern., Inc.*, 679 F.2d 516, 530 (5th Cir. 1982).

Defendants assert that Plaintiff must plead Defendants' market share in order to establish that Defendants have the ability to monopolize the relevant market. *See, e.g., Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998) (holding that the plaintiff had failed to state a claim when it failed to allege facts such as the defendant's market share in the relevant market and the barriers to the plaintiff's entry into the market); *Dimmitt Agri Industries, Inc. v. CPC Intern. Inc.*, 679 F.2d 516, 530-31, 533-34 (5th Cir. 1982), *cert. denied* 103 S.Ct. 1770 (describing evidence of a defendant's market share as the principal tool used to determine the existence of market power); *Monsanto Co. v. Scruggs*, 342 F.Supp.2d 568, 581 (N.D. Miss. 2004), *aff'd* 459 F.3d 1328 (Fed. Cir. 2006) (explaining that market share is one of the most crucial factors in evaluating whether a firm possesses market power); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 330 (D.N.J. 1999) (holding that a conclusory statement that the defendant controls the majority of the market is not sufficient to state an anti-trust claim); *Valet Apartment Services, Inc. v. Atlanta Journal and Constitution*, 865 F.Supp. 828, 832-833 (N.D. Ga. 1994). In addition, the Fifth Circuit holds that, as a matter of law, a market share of less than 50 percent is insufficient for a monopolization claim, but is not insufficient for an attempted monopolization claim. *See Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984); *Dimmitt*

*Agri Industries, Inc. v. CPC Intern. Inc.*, 679 F.2d 516, 530-31, 533-34 (5th Cir. 1982), *cert. denied* 103 S.Ct. 1770; *Rockbit Industries U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F.Supp. 1544, 1549-50 (S.D. Tex. 1991).

Market power is the ability to "control prices or exclude competition." *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 935 (6th Cir. 2005) (holding that a trier of fact could conclude that the defendant possessed monopoly power where it held 70 and 89 percent of the relevant markets and, after the plaintiff left the market, the defendant raised rates and reduced the number of flights). *See also American Tobacco Co. v. U.S.*, 328 U.S. 781, 811 (1946) (holding that the conspirators at issue had the power and intent to exclude actual and potential competitors). A plaintiff, therefore, does not need to define a market if it can support its claim with direct evidence that the defendant controlled prices or excluded the competition. *See, e.g., PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (holding that the plaintiff had failed to provide sufficient evidence of market power where the defendant had only a 64 percent market share); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.* 28 F.3d 1379, 1386 (5th Cir. 1994) (defining market power, and holding that the plaintiff had failed to define the relevant market in part because there was no evidence from which the jury could measure the defendant's ability to control prices or exclude competition). *See also Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1191 (5th Cir. 1985) (holding that, where the plaintiff did not provide sufficient evidence that the defendant could exclude competition, the plaintiff had failed to support a claim for monopolization). Here, Plaintiff defines the relevant market as the market for fixed-price natural gas baseload transactions at the HSC. Plaintiff alleges that Defendants controlled a large percentage of

HSC market trades on ICE and intentionally manipulated and suppressed prices using their substantial physical assets and contracts with other natural gas producers. Plaintiff's allegations of market share, however, vary throughout the Complaint. As stated earlier, in one part, Plaintiff alleges that Defendants controlled 80 percent of the ICE transactions during bidweek (Compl. ¶ 2); in another, that they controlled 80 percent of ICE transactions generally (Compl. ¶ 33); and, in other parts, that Defendants controlled 80 percent of total sales for fixed-price natural gas (Compl. ¶ 38). Without understanding the duration of Defendants' market power or its dominance of HSC natural gas sales as opposed to ICE natural gas sales, it is unclear whether Plaintiff has provided sufficient evidence to suggest that Defendants had monopoly power in the relevant market over the class period. Without more, Plaintiff has failed to state a claim.

### 3. Sherman Act Section 1

Section 1 of the Sherman Antitrust Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. There are two types of anti-trust analysis: one for agreements that are so plainly anti-competitive that they may be deemed illegal per se. If the complained-of actions are not *per se* unlawful, under the Sherman Act, the plaintiff must prove that the actions unreasonably restrained trade contrary to the judicially constructed rule of reason. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.*, 200 F.3d 307, 312 (5th Cir. 2000). The Supreme Court noted that, to a certain extent, every contract is a restraint on trade, and therefore, courts should rely on the common law Rule of Reason, that is, whether the challenged conduct or acts "were unreasonably restrictive of competitive conditions." *See*

*Nat'l Soc. Of Prof. Engineers v. U.S.*, 435 U.S. 679, 690 (1978). This rule of reason requires the court to examine the unreasonableness of the asserted restraint on competition, "looking to 'all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint....'" *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Centers, Inc.*, 200 F.3d at 312 (*quoting Medical Arts Pharmacy v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502, 504 (2d Cir. 1982)). To allege a claim under the Rule of Reason, a plaintiff must allege (1) a relevant product and geographic market, and (2) that the alleged conduct had a substantial anticompetitive effect in the relevant market. *See Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 627 (5th Cir. 2002).

To prevail on a Section 1 claim, a plaintiff must show that the defendants (1) engaged in concerted action (2) that produced some anti-competitive effect (3) in the relevant market. *Golden Bridge Technology, Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008); *Stewart Glass & Mirror, Inc.* 200 F.3d at 312 -317 (5th Cir. 2000) (quoting *Johnson v. Hospital Corp. of America*, 95 F.3d 383 (5th Cir.1996)); *Eskofot A/S v. E.I. du Pont de Nemours & Co.*, 872 F.Supp. 81, 90-91 (S.D.N.Y. 1995). The complaint does need to exclude the possibility of independent action. *See, e.g., Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984); *Viazis v. American Ass'n of Orthodontists*, 314 F.3d 758, 762 (5th Cir. 2002); *Toscano v. PGA Tour, Inc.*, 70 F.Supp.2d 1109, 1115-16 (E.D. Cal. 1999). That is, the defendants must have "had a conscious commitment to a common scheme designed to have an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. at 768; *Golden Bridge Technology, Inc.*, 547 F.3d at 272; *Viazis v. American Ass'n of Orthodontists*, 314 F.3d at 763. The

Supreme Court explains "that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made ... [it requires] enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). A naked allegation of a conspiracy or agreement, without more, is not sufficient to state a claim under Section 1. *Id.* at 1966.

Defendants contend that Plaintiff failed to state a claim because it did not allege that the customers to whom Defendants sold natural gas were participants in the scheme to violate the anti-trust laws. Plaintiff responds that, to state a Section 1 claim, it need only allege that a contract resulted in an unreasonable restraint of trade even if it has not alleged a conspiracy.

A contract between a buyer and a seller, without more, does not violate antitrust laws—the terms of an immediate agreement to sell does not, without more, place illicit restrictions on the parties' behavior. *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1203 (7th Cir. 1981) (holding that contracts between the defendant and auto repair shops to provide services at the prevailing competitive rate in return for referrals were not illicit contracts). Likewise, the fact that a person accepts the terms of a contract does not, without more, generate the type of concerted action necessary to violate Section 1. *American Airlines v. Christensen*, 967 F.2d 410, 413-414 (10th Cir. 1992) (holding that the fact that members accepted the terms of its travel awards does not generate the type of concerted action that violates Section 1).

Here, Plaintiff alleges that "Defendants exerted their market power by entering into contracts with other market participants for the sale of fixed-price natural gas at

HSC." (Compl. ¶ 103.) Plaintiff has not made sufficient allegations to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement between Defendants and these purchasers of fixed-price natural gas. Unlike *Eskofot*, the Plaintiff has failed to make sufficient allegations to suggest that there was no independence of action between Defendants and their natural gas customers. *Cf. Eskofot A/S v. E.I. Du Pont de Nemours & Co.*, 872 F.Supp. 81 (S.D.N.Y. 1995) (holding that the plaintiff had stated a Section 1 claim when the merger and contract at issue sufficiently demonstrated that there was no independence of action). It seems illogical to conclude that those on the buying side of the fixed-price natural gas market, without more, must have acted in concert with Defendants because they entered into contracts with them. It seems equally plausible to assume that Defendants' buyers were unwitting victims of the alleged scheme, not its perpetrators.

In addition, Plaintiff's Complaint bases its Section 1 claim on the conduct of Defendants, all of whom are within the same corporation. Defendants argue that Plaintiff only alleges a conspiracy among the Defendants who are all affiliates; consequently, they fail to state a claim because all Defendants are involved in the same enterprise and cannot be independent co-conspirators. As Defendants note, however, prior to January 26, 2005, HPL was not affiliated with ETP or other ETP's then-affiliates. (Energy Transfer Partners, L.P. Form 10-K at 3-4.) The relevant class period is December 2003 through December 2005. Defendants contend that, for all periods, Plaintiff fails to allege any unity of purpose or conscious commitment to a common scheme.

The internally coordinated conduct of a corporation and its divisions or its subsidiaries cannot give rise to a claim under Section 1. *See Copperweld Independence*

13

*Tube Corp.*, 467 U.S. 752, 770-771 (1984); *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1192 (5th Cir. 1985); *Hood v. Tenneco Texas Life Ins. Co.*, 739 F.2d 1012, 1015 (5th Cir. 1984); *Guzowski v. Hartman*, 969 F.2d 211, 213-214 (6th Cir. 1992). Even if a single firm's restraints directly affect prices as concerted action might have affected them, there is no Section 1 liability without an agreement. *See Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 325 (5th Cir. 1998). Consequently, the only period for which Plaintiff might have plausibly stated a Section 1 claim is before January 2005 when HPL was not affiliated with ETP. Plaintiff, however, has not particularly alleged that HPL conspired with the rest of the ETP corporate family. Plaintiff, instead, alleges, for example, only that "Traders at ETP's various business units [including HPL] acted in concert and considered the benefit to the ETP corporate family as a whole ...." (Pl. Compl. ¶ 49.) In other portions of the Complaint describing incidents prior to January 2005, Plaintiff does not specifically allege that HPL acted in concert with other Defendants and does not separately allege that HPL acted in concert with the other Defendants both before and after it became an subsidiary of ETP. (Pl. Compl. ¶ 79-80.)

Defendants' Motion to Dismiss will be granted as to this claim. Plaintiff will be given leave to amend to include allegations that raise a reasonable expectation of a conspiracy between HPL and the other Defendants in the applicable time frame.

### 4. Anti-Trust Injury

Defendants argue that Plaintiff's injuries were allegedly from unilateral lower, non-predatory prices and these injuries are not the type that antitrust laws are designed to prevent. Plaintiff does not allege that it is a participant in the market in which competition

14

was allegedly restrained but argues that Plaintiff's injury was a necessary step towards the Defendants' anti-competitive activity.

The Clayton Act, 15 U.S.C. § 15(a), provides a private cause of action for a person "injured in his business or person by reason of anything forbidden in the anti-trust laws." Courts have long held that suits under section 4 of the Clayton Act (15 U.S.C. § 15(a)) for violation of either Section 1 or Section 2 of the Sherman Act require not only injury to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing. *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). "Private antitrust liability under § 4 of the Clayton Act requires the showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage." *Robinson v. Texas Auto. Dealers Ass'n*, 387 F.3d 416, 422 (5th Cir. 2004) (quoting *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (1982)). Anti-trust injury should be evaluated from the plaintiff's "position in the marketplace." *See Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

Anti-trust injury is necessary but not sufficient to establish standing. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5 (1986). The court must consider whether a plaintiff is a "proper plaintiff" to sue for damages, examining such factors as (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) the improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws (antitrust injury); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery

or complex apportionment of damages. *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 422 (5th Cir. 2001) (upholding a dismissal of cigarette smokers' claims for alleged anti-trust violations against cigarette manufacturers because smokers are only indirectly affected by restraints on the distributors, and the cigarette manufacturers could be exposed to double liability since distributors could properly sue). *See also McCormack v. National Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988); *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988).

In *Blue Shield of Virginia v. McCready*, the Supreme Court announced its concern that indirect anti-trust injuries might lead to duplicative recovery by allowing many of those along the chain of distribution to claim damages from the anti-trust laws. 457 U.S. 465, 474-75. In addition, the Court advised lower courts to dismiss suits where the alleged injury is "too remote" from the anti-trust violation. *McCready*, 457 U.S. at 476. In analyzing remoteness, the Court examined "(1) the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, [] the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *McCready*, 457 U.S. at 478.

In *McCready*, a Blue Shield insured alleged an anti-trust violation from the insurer's policy of reimbursing psychotherapy administered by psychiatrists but not by psychologists. The Court decided that the insured had standing because she was in the affected market—a consumer of psychotherapy services under the Blue Shield plan. 457 U.S. at 480-81. The Court held that, even though the alleged goal of the conspirators was

to halt encroachment of psychologists into psychiatrists' market, consumers of psychotherapy had standing to sue. As the Court explained:

> Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to [the plaintiff] and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely "the type of loss that the claimed violations ... would be likely to cause."

*McCready*, 457 U.S. at 479 (quoting *Brunswick*, 429 U.S. at 489).

"Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Hughes v. Tobacco Institute Inc.*, 278 F.3d 417, 423 (5th Cir. 2001). If two markets are closely related, however, such as the cash and futures market for a commodity, anti-competitive behavior in one market might give rise to anti-trust injury for participants in another market. *See Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918, 929 (7th Cir. 1995) (holding that soybean sellers who decided not to sell in the cash market because of the defendants' challenged conduct in the futures market did not have standing to sue whereas those who did sell did have standing); *see also In re Copper Antitrust Litigation*, 98 F.Supp.2d 1039, 1050 (W.D. Wis. 2000) (relying on *Sanner*).

Here, Plaintiff is an energy company that sold natural gas based on the *Inside FERC* prices. Even if Plaintiff could amend its Complaint to survive a subsequent motion to dismiss, it unlikely that Plaintiff has alleged proper anti-trust standing. Taking Plaintiff's allegations as defining a proper relevant market, although Plaintiff does not allege that it sold natural gas in the HSC market itself, it stated that it sold natural gas based on the *Inside FERC* Index price. This conduct bears some similarity to *Sanner* in

which the Seventh Circuit held that farmers had standing to sue for sales made in the cash market based on actions in the futures market. In *Sanner* however, the Seventh Circuit noted that the defendant allegedly intended to affect both the futures and the cash market. *Sanner*, 62 F.3d 918, 929-30. Here, Plaintiff alleges that it was injured by decreased index prices that were factored into sales made in related markets. Unlike the plaintiff in *McCready*, Plaintiff's injuries were not a necessary step in Defendants' scheme that involved manipulating the prices at the HSC market and then buying natural gas at depressed prices based on the HSC Index. Similarly, unlike the plaintiffs in *Blanchard* who were investors, retailers, and competitors in the gold market, Plaintiff does not allege that it participates in the HSC market. *See Blanchard v. Barrick Gold*, 2003 WL 22071173, at *1, *5. Plaintiff's Complaint must be dismissed for lack of anti-trust injury. If Plaintiff is able to redefine the relevant market or plead and define a secondary market such that it can properly allege anti-trust injury, its came may be allowed to proceed. At this time, the Court does not find that Plaintiff has properly alleged anti-trust injury.

### C. Leave to Amend

Defendants argue that leave to amend should not be granted. Under the Federal Rules, however, leave to amend should be freely granted. Fed. R. Civ. P. 15(a). Plaintiff has not received numerous chances to amend without correcting pleading flaws. Leave to amend shall be granted. If it chooses to amend, Plaintiff is to file an amended complaint within 30 days of the entry of this Order.

### III. CONCLUSION

Defendants' Motion to Dismiss is **GRANTED IN PART** as Plaintiff has failed to state a Sherman Antitrust claim. However, Defendants' Motion is **DENIED IN PART**

and Plaintiff will be allowed leave to amend to allege a proper Section 1 and/or Section 2 claim and anti-trust injury, consistent with this Order.

**IT IS SO ORDERED.**

**SIGNED** this 25th day of March, 2009.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE