UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RIO GRANDE ROYALTY COMPANY, INC., on behalf of itself and all others similarly situated, Plaintiff, | § § § § § | |
| v. | § § | No. H-08-cv-0857 |
| ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER COMPANY, ETC MARKETING, LTD., and HOUSTON PIPELINE COMPANY, Defendants. | § § § § § § | |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiff's Motion For Leave to Amend To Assert a Claim for Common Law Fraud (Doc. No. 31) and Defendants' Cross-Motion To Dismiss the Proposed Class Action Complaint (Doc. No. 33). For the following reasons, Defendants' Motion must be granted and Plaintiff's Motion must be denied.

## I. INTRODUCTION

This case involves Sherman Act claims for unlawful monopolization and attempted monopolization in the market for fixed-price natural gas baseload transactions at the Houston Shipping Channel ("HSC"). Plaintiff Rio Grande Royalty Company, Inc. is an energy company that sold natural gas based on the *Inside FERC's Gas Market Report* ("*Inside FERC*") HSC Index[1] during the class period, December 2003 to December 2005 ("Class Period"). (Compl. ¶ 11.) Defendants allegedly dumped natural

---

[1] The HSC Index is defined as the published price index for HSC for monthly natural gas as determined by such trade publications as *Platts Inside FERC's Gas Market Report ("Inside FERC")*. (PAC ¶ 4.) Defendants aver that this definition does not make sense because it suggests that the HSC Index is broader than just the Index published by Platts and assumes that HSC Index refers solely to the Platts' Index.

gas to drive down the price at the HSC and reported that depressed price to *Inside FERC* to maintain a monopoly in their part of the natural gas market. (*Id.* at ¶ 2.) Defendant Energy Transfer Partners, L.P. ("ETP") is a publicly traded energy company that processes, transports, and stores natural gas. The company also owns pipelines in West Texas, including the Houston Pipeline Company ("HPL"), an intrastate natural gas pipeline system that serves the HSC natural gas market. (*Id.* at ¶ 12.) Defendants Energy Transfer Company ("ETC") and HPL are subsidiaries of ETP that, among other business interests, buy and sell physical and financial natural gas contracts for ETP, sometimes under the name ETC Marketing, Ltd, also a subsidiary of ETP. (*Id.* at ¶¶ 13-14.) The relevant facts in Plaintiff's Complaint are detailed in the Court's prior Order ruling on Defendants' first Motion to Dismiss ("Order").

In the Order, the Court granted Defendant's Motion to Dismiss Plaintiff's Sherman Act Section 1 and Section 2 claims. The Court dismissed Plaintiff's Section 2 attempted monopolization claims because the Complaint failed to allege illegal exclusionary conduct or predatory pricing. Additionally, it dismissed Plaintiff's Section 2 monopolization claim because the Court was unable to determine whether Defendants possessed monopoly power in the relevant market. Also, it found that Plaintiff had not established the anti-trust injury necessary for standing under the Clayton Act. In its Proposed Amended Complaint ("PAC"), Plaintiff now reasserts claims under the Clayton Act (15 U.S.C. §§ 15, 26), alleging that Defendants violated Section 2 of the Sherman Act by attempted and actual monopolization (15 U.S.C. § 2) and seeks leave of Court to add a common law fraud claim. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

## II. MOTION TO DISMISS

### A. Standards

#### 1. Rule 15(a)

Leave to amend a complaint is freely given when justice so requires. FED. R. CIV. P. 15(a). "The trial court should consider whether permitting the amendment would cause undue delay in the proceedings or undue prejudice to the nonmoving party, whether the movant is acting in bad faith or with a dilatory motive, or whether the movant has previously failed to cure deficiencies in his pleadings by prior amendments." *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, Inc.  690 F.2d 1157, 1163 (5th Cir. 1982). The trial court should also consider prejudice to the opposing party and futility of amendment. *See, e.g.*, *Torch Liquidating Trust ex. rel. Bridge Associates L.L.C. v. Stockstill*, 561 F.3d 377, 391 (5th Cir. 2009); *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 268 (5th Cir. 2004). When an amended complaint cannot survive a motion to dismiss pursuant to 12(b)(6), however, allowing leave to amend would be futile. *Briggs v. Mississippi*, 331 F.3d 499, 508 (5th Cir. 2003) (citing *Lewis v. Fresne*, 252 F.3d 352, 360 (5th Cir. 2001)).

#### 2. Rule 12(b)(6)

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to

relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. --, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

### B. Analysis

#### 1. Plaintiff's Proposed Common Law Fraud Claim

Plaintiff notes that the Court did not attach conditions when it allowed Plaintiff leave to amend its Complaint within 30 days of the entry of the Order. Plaintiff contends that, even if the Order did not explicitly allow Plaintiff to add a common law fraud claim, the Court should give leave to amend to add a common law fraud claim at this time because of the permissive standard of FED. R. CIV. P. 15(a). Defendants respond that Plaintiff should be denied leave to add a common law fraud claim because Plaintiff fails to plead the elements necessary for Federal Rule 9(b) and the purported claim is largely barred by the statute of limitations. Plaintiff replies that it more than adequately states a common law fraud claim.

To recover on an action for fraud, the party must prove that: (1) a misstatement or omission (2) of material fact (3) with the intent to defraud, (4) the speaker made it with the intention that it should be acted upon by the party; (5) on which the plaintiff relied, and (6) which proximately caused the plaintiff's injury. *Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997), *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 490 F.Supp.2d 784, 792-93 (S.D. Tex. 2007).  A party may be liable for

common law fraud based on the failure to disclose a material fact within the knowledge of that party. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). For allegations of fraud, Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). That is, the plaintiff must plead the "who, what, when, where, and how" of the alleged fraud. *Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *U.S. v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

### a. Misrepresentation

In the PAC, Plaintiff alleges that Defendants reported false and misleading natural gas trade data to Platts. (PAC ¶ 122.) Defendants aver, however, that this statement is conclusory. Plaintiff's allegations, they contend, are that Defendants accurately provided Platts the price and volume information for sales made.

Plaintiff responds that Defendants intentionally misstated the true market price of natural gas sold at HSC because of their scheme to depress prices. Plaintiff notes that, throughout the PAC, it details how Defendants allegedly manipulated sales of fixed-price natural gas at HSC and then submitted that sales information to *Inside FERC*. (PAC ¶¶ 36, 62, 70-72, 75, 79, 80-81, 83-84, 122-25.) After reviewing Plaintiff's allegations, however, the Court concludes that Plaintiff alleges only that Defendants purportedly wrongfully manipulated the fixed-price natural gas baseload transactions at HSC, but then truthfully reported the price and volume information from those transactions. Plaintiff's allegations based on Defendants' purported affirmative misstatements must fail.

### b. Duty to Disclose

Defendants contend that, because Plaintiff has not pled an affirmative misrepresentation of material fact, Plaintiff's fraud claim rests on fraudulent nondisclosure. Defendants argue that Plaintiff's contention that industry participants use the HSC Index as a reference that may be reflective of market values is not equivalent to an allegation that the Index actually represents the "market forces of supply and demand" sufficient to create a duty to report anything beyond the price and volume for trades. Defendants note that Plaintiff describes the HSC Index as "an index price representative of transactions at [certain trading points]." (PAC ¶ 37.)

Plaintiff avers that Defendants knowingly and intentionally failed to disclose that the prices of HSC fixed-price baseload natural gas that they reported represented the true market forces of supply and demand. Defendants purportedly knew that the purpose of the HSC Index published by Platts was to reflect the actual market conditions at HSC and not an intentionally and artificially depressed price. Plaintiff avers that Defendants' duty arose from their partial disclosure of information.

Specifically, Plaintiff contends that industry contracts often contain a price term that refers to the HSC Index price because it "provides an objective price reference for arm's-length transactions that may be reflective of market values." (PAC ¶ 38.) Plaintiff further alleges that "[m]arket participants price physical deals based on the *Inside FERC* index in part because it is understood that neither contracting party can manipulate the HSC Index price on which their contract is based." (PAC ¶ 38.) Plaintiff also contends that Defendants' conduct created a false impression of supply and demand in the

Relevant Market, and their conduct suppressed prices to non-competitive, commercially unreasonable levels. (PAC ¶¶ 4, 36, 62, 81, 83-84, 86.)

Failing to disclose information is equivalent to a false representation only when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent. *In re International Profit Associates, Inc.*, 274 S.W.3d 672, 678 (Tex. 2009). A duty to disclose may arise when "(1) the parties have a confidential or fiduciary relationship, (2) when one party voluntarily discloses information, which gives rise to the duty to disclose the whole truth, (3) when one party makes a representation, which gives rise to the duty to disclose new information that the party is aware makes the earlier representation misleading or untrue, or (4) when one party makes a partial disclosure and conveys a false impression, which gives rise to the duty to speak." *See, e.g.*, *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.— Houston [14 Dist.] 2007, no pet.) (internal citations omitted); *See, e.g. In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 490 F.Supp.2d 784, 794 (S.D.Tex. 2007). An action for fraud may lie if "one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth." *GMAC Commercial Mortg. Corp. v. East Texas Holdings, Inc.*, 441 F.Supp.2d 801, 808 (E.D. Tex. 2006) (internal citations omitted). Plaintiff contends that the PAC includes allegations that Defendants knew that the purpose of Platts' HSC Index is to reflect actual market conditions.

Plaintiff's PAC, however, fails to allege that the HSC Index represents or is calculated to represent true supply and demand. Rather, it contends that the Index price is

"representative of transactions" at points, including the HSC, or that it "may be reflective of market values." (*Id.* at ¶¶ 37-38.) On the other hand, Plaintiff does allege that it is understood that the HSC Index is not manipulable. (PAC ¶ 38.) Even assuming that Plaintiff has alleged a misrepresentation because Defendants failed to disclose that they were manipulating the HSC Index,[2] Plaintiff has not stated a fraud claim because it has failed to sufficiently allege Defendants' intent to defraud.

### c. Intent to Defraud

Defendants contend that Plaintiff does not allege the requisite intent to defraud because it only alleges that Defendants intended to depress the HSC Index—not that they intended to deceive Plaintiff. Plaintiff responds that the PAC includes allegations that Defendants knew that natural gas sellers in the Related Submarket would rely on their misrepresentations to Platts. It contends that statements by an unknown trader that "these producers they're going to hate it," suggests that Defendants knew that producers who sell natural gas in "natural gas sales transactions in the United States during the Class Period at a price determined by the published HSC Index" (the "Related Submarket") would rely on misrepresentations to Platts. (PAC ¶ 90.)

"[A] misrepresentation made through an intermediary is actionable if it is intended to influence a third person's conduct." *Ernst & Young, LLC v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001). One who makes a fraudulent misrepresentation is liable to those who the maker intends or "has reason to expect" will act in reliance upon the misrepresentation. *Ernst & Young, LLC v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d at 578-80 (holding that generalized industry practice or what is expected in the business

---

[2] *See, e.g,. Minpeco, S.A. v. Hunt*, 718 F.Supp. 168, 176-177 (S.D.N.Y. 1989) (discussing common law fraud in the context of a fraud on the market case).

community is insufficient to show an "especial[] likelihood" that investors would rely on the defendants' purported misstatements). For this reason, in *Pacific Mutual*, the Texas Supreme Court granted summary judgment for the defendant because a plaintiff could not establish intent when it purportedly relied on a defendant's audit opinion that was disseminated through prospectuses and documents filed with the SEC. The *Pacific Mutual* court clarified that "even an obvious risk that a misrepresentation might be repeated to a third party is not enough to satisfy the reason-to-expect standard."[3] *Ernst & Young*, 51 S.W.3d at 580. *Compare Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, -- S.W.3d --, 2009 WL 795668, at *7 (Tex. Mar. 27, 2009) (holding that a directed verdict for the defendant on the plaintiffs' fraud claim was in error because some evidence supported claims that there was a special likelihood that the plaintiffs, royalty owners, would rely on the defendant's inaccurate filings with the Railroad Commission as to its plugging reports on the leases).

Allegations that a person in the plaintiff's position commonly relies on a certain type of representation is insufficient to satisfactorily plead reliance. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 325-27 (5th Cir. 2002) (applying *Pacific Mutual* and concluding that the plaintiffs had not alleged reliance based on their allegations that investors typically rely on representations in SEC filings like the opinion at issue, regarding the financial health of a merger); *In re Enron Corp. Securities, Derivative & "ERISA" Litigation*, 490 F.Supp.2d at 822-25 (applying *Pacific Mutual* to find that the plaintiffs had not established an intent to induce reliance on financial reports, SEC-filed documents, analyst recommendations simply because these materials are

---

[3] The court cited with approval a case from the Supreme Court of New Jersey distinguishing fraud on the market from common law fraud. *See Pacific Mutual*, 51 S.W.3d at 578 n. 6 (citing *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 754 A.2d 1188, 1196-97 (2000)).

disseminated in the marketplace and it was foreseeable that the information would reach the plaintiffs). *Cf. Matis v. Golden*, 228 S.W.3d 301, 310 (Tex. App.—Waco 2007, no pet.) (holding that the plaintiffs had alleged reliance when the defendants "were not merely relaying information, but their representations were made with special knowledge … [based on their] access to unique information regarding the investment process"); *Tex. Capital Sec., Inc. v. J.D. Sandefer*, 58 S.W.3d 760, 772 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (holding that the plaintiffs had sufficient proof of reliance when the plaintiffs relied on information that the defendant asked a broker to convey to the plaintiffs).

Plaintiff avers that Defendants intended or had reason to expect that Plaintiff would rely on Defendants' misrepresentations of natural gas trade data to Platts and, therefore, Defendants had the requisite intent to defraud. (PAC ¶¶ 123-24.) This case is more like *Pacific Mutual* than cases in which courts have found that the plaintiff has not adequately pled reliance. Plaintiff does not sufficiently allege that its reliance is especially likely and justified or that Defendants knew that Plaintiff would rely on the information in the type of transaction Defendants contemplated. Plaintiff's PAC describes Defendants' alleged scheme to manipulate the HSC market, and consequently, the HSC Index. Plaintiff essentially alleges that it was industry practice for certain traders to rely on the HSC Index in making contracts, as did the plaintiffs in *Pacific Mutual*. Plaintiff provides no allegations that specifically connect Defendants' purported misstatements to it. Even though Plaintiff's reliance on Defendants' purported misstatements might have been obvious, the Court concludes that this case falls much closer to the cases in which no intent to defraud is found. For the foregoing reasons,

Defendant's Motion to Dismiss Plaintiff's fraud claim will be granted and leave to amend will be denied.

### 2. Monopolization or Attempted Monopolization Claim, Sherman Act Section 2

Defendants contend that Plaintiff's PAC fails to allege a Section 2 claim because it has failed to allege conduct that could be deemed exclusionary and give rise to antitrust liability. Defendants contend that Plaintiff fails to allege durable market monopoly power in the relevant market. Plaintiff now defines the relevant market as "fixed-price natural gas baseload transactions ... at the HSC executed on the ICE during bidweek" ("Relevant Market"). (PAC ¶ 2.) Defendants contend that the PAC is silent about the Defendants' share of total sales in the Relevant Market over time, the strength of other competitors, and the ease of entry and expansion in the Relevant Market.[4] Plaintiff responds that the PAC contains detailed and consistent factual allegations concerning Defendants' exercise of control over prices in the Relevant Market during the Class Period sufficient to state an antitrust claim.

As noted in its previous Order, in order to state a claim for actual monopolization, the plaintiff needs to allege that the violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior

---

[4] Defendants also contend that Plaintiff, in its PAC, does not allege a plausible relevant product market because it does not describe a market that encompasses all interchangeable substitute products and does not define the market with reference to the cross-elasticity of demand and reasonable interchangeability. *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 237-38 (2d Cir. 2008) (affirming a dismissal in part for failure to plead a plausible relevant market). Defendants note that, for example, Plaintiff provides no indication as to why purchasers of fixed-price baseload natural gas at HSC during bidweek could not substitute gas purchased off exchange or purchased on another exchange for that purchased over ICE. The Court agrees and finds unavailing Plaintiff's caselaw cited for the proposition that an antitrust claim may not be dismissed on a motion to dismiss on the basis of an inadequately defined relevant market. The Court, for the sake of completeness, also discusses Defendants' remaining grounds for dismissing Plaintiff's Sherman Antitrust claims.

product, business acumen or historic accident. *See U.S. v. Grinnell*, 384 U.S. 563 (1966); *Stearns Airport Equipment Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999). The possession of monopoly power and charging monopoly prices, without more, is not unlawful, and is an important element of the free-market system. *See Verizon Communications, Inc. v. Trinko*, 540 U.S. 398, 407 (2004). To demonstrate attempted monopolization, a plaintiff must prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Surgical Care of Hammond, L.C. v. Hospital Service Dist. No. 1. of Tangipahoa Parish*, 309 F.3d 839, 839 (5th Cir. 2002). Predatory or anticompetitive conduct is conduct that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32 (1985)). *See also Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000).

### a. Exclusionary Conduct

Plaintiff contends that Defendants intentionally suppressed prices in the natural gas commodities market by altering the interaction between supply and demand and creating an artificial and manipulated market for natural gas, with a deleterious effect on competition. Plaintiff again advances its theory that anticompetitive conduct that resulted in the artificial lowering of commodity prices is actionable, irrespective of whether such unlawfully suppressed prices were predatory. Plaintiff's cited cases, as Defendants note, all involve concerted action rather than Section 2 single firm attempts to set prices. *Strobl*

*v. NYMEX*, 768 F.2d 22, 28 (2d Cir. 1985) (holding that anti-trust laws may be applied to violations involving commodities for a case that involved a conspiracy to manipulate prices); *Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738 F.Supp. 1472 (S.D.N.Y. 1990). *See also Sanner v. Board of Trade of City of Chicago*, 62 F.3d 918 (7th Cir. 1995) (discussing anti-trust standing under the Clayton Act, but not reaching the merits of the Sherman Act claims).

Plaintiff relies heavily on *Blanchard* for its claim that a Section 2 monopolization claim may survive absent claims of predatory pricing where the defendants are able to artificially manipulate the relevant price. *Blanchard & Co., Inc. v. Barrick Gold Corp.*, No. Civ. A. 02-3721, 2003 WL 22071173 (E.D. La. Sept. 3, 2003). In denying the defendant's motion to dismiss the plaintiffs' Section 2 monopolization claim, even though they had not made out a claim for predatory pricing, the Judge reasoned:

> [E]xcising Plaintiffs' reliance on predatory pricing from the Complaint, the Court finds that a cognizable claim for monopolization survives. Ignoring the minutiae, the Complaint alleges that [a defendant], in combination with [another defendant] is *artificially* manipulating the gold market by the sheer size and volume of its activity. This claim will stand or fall on whether the alleged conduct creates an artificial market that manipulates the price of gold or whether the complained of consequences are simply the byproduct of stellar business acumen.

*Blanchard*, 2003 WL 22071173, at *5 n.4 (concluding that the plaintiffs had properly alleged anti-trust standing). In discussing the defendants' purported substantive monopolization claim, the Court appeared to rely on the illegal conspiracy to conclude that the defendants could have artificially manipulated prices to create a monopoly:

> [defendant A] contends that the sole anticompetitive conduct alleged in the Complaint is Plaintiffs' predatory pricing claim. The Court disagrees. As discussed above, the Court discounts Plaintiffs' predatory pricing claim and prefers to read the Complaint more generally. In general, the Complaint sufficiently alleges an anticompetitive scheme to artificially

manipulate the price of gold... The Court finds that the Complaint adequately states a claim for [Defendant A's] acquisition or attempted acquisition of monopoly power in the gold mining market and [defendant B's] acquisition or attempted acquisition of monopoly power in the gold derivatives market.

*Id.* at *9. The *Blanchard* court appears to find exclusionary conduct from the defendants' purported scheme that involved coordinated manipulation in several markets. *Blanchard* is distinguishable from the current case because Plaintiff does not allege an illegal combination creating a monopoly in different markets because of concerted action. *Blanchard* does not stand for the proposition that low, but not predatory, prices, absent other evidence of exclusionary conduct, could support a Section 2 monopolization claim.

Plaintiff has failed to amend to allege predatory pricing or other actionable exclusionary conduct and therefore, this claim must be dismissed for the reasons described in the Court's previous Order and leave to further amend will be denied. Allegations regarding low, but not predatory prices, may not support a Section 2 claim. *See, e.g., Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 129 S.Ct. 1109, 1119-21 (2009).

### b. Monopoly Power

Defendants contend that Plaintiff again fails to provide more than snapshots of Defendants' market share in the Relevant Market and these allegations are therefore insufficient to state a monopolization or attempted monopolization claim. Plaintiff responds that it now provides detailed and consistent factual allegations of Defendants' exercise of control over prices in the Relevant Market during the Class Period. It contends that Defendants dominated sales of fixed-price natural gas at HSC during bidweek, often comprising 80 percent or more of those sales. (PAC ¶¶ 36, 41, 69, 78.)

Plaintiff contends that Defendants comprised at least 55 percent of fixed-price natural gas baseload sales during bidweek for those months. (PAC ¶ 45.) Plaintiff avers that it alleges sufficient evidence of Defendants' position in the market because it provides allegations of 10 separate periods of short-term price suppression over two years. (PAC ¶¶ 2, 54-84.)

Defendants respond that Plaintiff only alleges isolated incidents of high volume, low-priced sales on fourteen days over a two-year period and does not allege Defendants' ability to maintain those low prices over a significant period of time. Moreover, Defendants note that, if Plaintiff avers that Defendants were attempting to monopolize the broader Related Submarket, the PAC lacks allegations necessary to state this claim because Plaintiff does not justify the proffered submarket definition or Defendants' position in the larger market.

Plaintiff's Relevant Market is limited to trades made during bidweek, the last week of each month. Even within that market definition, Plaintiff alleges only that Defendants possessed an ability to suppress prices 10 times. "A distinction is often drawn between market power—some degree of power to affect price by increasing or reducing output—and monopoly power—the power to set a price significantly above the competitive level and to sustain such a price for a substantial period of time." *See* SULLIVAN & GRIMES, THE LAW OF ANTITRUST: AN INTEGRATED HANDBOOK 98 (2006). *See also Dimmit Agri Industries, Inc. v. CPC Intern., Inc.*, 679 F.2d 516, 530 (5th Cir. 1982). Monopoly power under Section 2 is something greater than the market power sufficient to establish a Section 1 claim. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992).

Plaintiff has alleged direct evidence that Defendants do possess some form of market power through their ability to manipulate prices up and down, but, even so, Plaintiff has not provided allegations that make it plausible to conclude that Defendants might have monopoly power over the Relevant Market. In addition, Plaintiff does not provide allegations about market conditions to assist the Court in determining whether Defendants might have possessed sustained monopoly power sufficient to support a claim for attempted monopolization. *See, e.g.*, *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.* 28 F.3d 1379, 1386 (5th Cir. 1994) (defining market power, and holding that the plaintiff had failed to define the relevant market in part because there was no evidence from which the jury could measure the defendant's ability to control prices or exclude competition). *See also Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1191 (5th Cir. 1985) (holding that, where the plaintiff did not provide sufficient evidence that the defendant could exclude competition, the plaintiff had failed to support a claim for monopolization). Taking all of Plaintiff's claims as true, it is doubtful that the Court could conclude that these allegations are sufficient to state a plausible monopolization or attempted monopolization claim. Regardless of the Court's holding on this point, it concludes that Plaintiff's antitrust claim fails because Plaintiff has not sufficiently alleged anti-trust injury.

### 3. Anti-Trust Injury

Defendants aver that Plaintiff's PAC fails to sufficiently allege anti-trust standing for two reasons. First, they contend that a seller's lost profits from non-predatory prices are not cognizable anti-trust injury. Second, they argue that the entire United States is not

a submarket that is related to the HSC such that injury in that market is inextricably intertwined with the injury in Relevant Market where alleged wrongdoing occurred.

Plaintiff concedes that it does not participate in the Relevant Market. (PAC ¶¶ 3, 14.) Rather, it claims that it participates in a "Related Submarket" of "natural gas sales transactions in the United States during the Class Period at a price determined by the published HSC Index." (PAC ¶ 3.) In its PAC, Plaintiff alleges that, by definition, the Related Submarket is inextricably intertwined with the Relevant Market because "[p]hyiscal natural gas contracts in the Related Submarket are priced by reference to the HSC index at various locations, including HSC." (PAC ¶ 38.) Consequently, Plaintiff avers that anticompetitive manipulation in the Relevant Market would "directly and predictably" lead to a correlated price change in the Related Submarket. *See In re Copper*, 98 F.Supp.2d at 1050. Consequently, Plaintiff contends that its injury was a necessary step in Defendants' scheme to purchase natural gas from sellers like Plaintiff at a price based on the intentionally suppressed HSC Index, including in the Related Submarket.

Anti-trust injury is necessary but not sufficient to establish standing. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n. 5 (1986). The Clayton Act, 15 U.S.C. § 15(a), provides a private cause of action for a person "injured in his business or person by reason of anything forbidden in the anti-trust laws." Courts have long held that suits under section 4 of the Clayton Act (15 U.S.C. § 15(a)) for violation of either Section 1 or 2 of the Sherman Act require not only injury to the plaintiff's business or property resulting from the alleged violation, but also a showing of antitrust injury and standing. *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007).

The court must consider whether a plaintiff is a "proper plaintiff" to sue for damages, examining such factors as (1) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws (antitrust injury); (2) the directness with which the alleged market restraint caused the asserted injury; (3) the speculative nature of the damages; and (4) the risk of duplicative recovery or (5) complexity in apportioning damages. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 (1983); *Hughes v. Tobacco Institute, Inc.*, 278 F.3d 417, 422 (5th Cir. 2001). *See also McCormack v. National Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988); *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1183 (5th Cir. 1988).

Nature of the Plaintiff's Alleged Injury

Defendants note that lost profits from non-predatory prices do not constitute anti-trust injury. In the context of an anti-trust standing regarding Section 1 claim, the Supreme Court held that non-predatory prices do not give rise to antitrust injury. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 US 331, 340 (1990) ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury."). As Plaintiff notes, it alleges injury from lower, but not predatory, prices. Apart from *Blanchard*, an opinion from a sister court involving an illegal combination in restraint of trade, Plaintiff cites no authority for the proposition that low, but not predatory, prices can support antitrust injury for a Section 2 claim.

Directness of the Injury

The rule in the Fifth Circuit is that plaintiffs whose injuries are experienced in another market do not suffer antitrust injury. *See, e.g. Norris v. Hearst Trust*, 500 F.3d at 466; *Hughes v. Tobacco Institute, Inc.*, 278 F.3d at 423 (adopting the reasoning of the district court). In its opposition to Defendants' original Motion to Dismiss, the Court discussed the applicability of two cases from the Seventh Circuit that provide a very limited exception to this rule, as persuasive authority. In its PAC, however, Plaintiff has not sufficiently alleged that it is involved in a market as described by the Seventh Circuit, and, under controlling Fifth Circuit precedent, Plaintiff's antitrust claims must be dismissed for failure to adequately allege anti-trust standing.

Defendants contend that, while Plaintiff avers that the Related Submarket is inextricably intertwined with the Relevant Market, its allegations are conclusory assertions of interrelatedness. (PAC ¶ 3, 38, 41, 36-37). Defendants contend Plaintiff at most describes that the HSC Index is factored into the prices in the Related Submarket. Moreover, they argue that the situation at issue here is distinguishable from that in *Sanner* and *In re Copper Antitrust Litigation* that involved the cash and futures market that converged at the time of delivery for the same commodity. *See Sanner v. Board of Trade of City of Chicago*, 62 F.3d at 929; *In re Copper Antitrust Litigation*, 98 F.Supp.2d 1039, 1050 (W.D. Wis. 2000). Plaintiff also relies on *Amarel v. Connell* for the proposition plaintiffs in "related" markets may sufficiently allege standing. In *Amarel*, the Ninth Circuit held that farmers involved in the paddy rice market alleged antitrust injury that could have flowed from the allegedly predatory pricing in the milled rice market. 102 F.3d 1494, 1512 (9th Cir. 1996). That court noted that the plaintiffs both supplied paddy rice to the mills and directly participated in the market for milled rice

"because their contractual arrangement with the independent mills gives them a share of the profits from the sale of milled rice. Moreover, plaintiffs insist that defendants' alleged conspiracy to restrain trade in various segments of the rice industry had as a central aim the elimination of the independent rice farmers." *Amarel,* 102 F.3d at 1510.

The Court agrees that Plaintiff's injury here is more remote than those experienced in the closely intertwined markets in the cases cited by Plaintiff. Here, while the HSC Index price is factored into the price in the Related Submarket, Plaintiff does not directly participate in the Relevant Market as did the farmers in *Amarel*, nor does it participate in a market that necessarily converges with the Relevant Market on the date of delivery, as in *Sanner* and *In re Copper Antitrust Litigation.*

In addition, Defendants contend that Plaintiff's allegations that injury in the Related Submarket was a necessary step in accomplishing Defendants' scheme are implausible. Plaintiff alleges monopolization and attempted monopolization in the Relevant Market through prices in the Relevant Market, without involving any "necessary steps" in the Related Submarket. *Cf. Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982).[5] Again, because Plaintiff is not a participant in the Relevant Market, it is not in the area of the economy endangered by the breakdown of competitive conditions. *See Norris*, 500 F.3d at 467 (discussing *McCready*).

<u>Risk of Duplicative Recovery, Multiple Lawsuits or Complex Damage Apportionment</u>

_____

[5] In addition, the Supreme Court advised lower courts to dismiss suits where the alleged injury is "too remote" from the anti-trust violation. *McCready*, 457 U.S. at 476. In analyzing remoteness, the Court examined "(1) the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, [] the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4." *Id.* at 478.

In *Blue Shield of Virginia v. McCready*, the Supreme Court announced its concern that indirect anti-trust injuries might lead to duplicative recovery by allowing many of those along the chain of distribution to claim damages from the anti-trust laws. 457 U.S. 465, 474-75. Here, many other players would have been injured by Defendants[1] purportedly illegal action—namely those involved directly in the HSC market.

Consequently, taking into account the relevant factors used to determine whether Plaintiff has alleged anti-trust standing, the Court finds that it has not and, for this additional reason, shall grant Defendants' Motion to Dismiss Plaintiff's antitrust claims.

### III. CONCLUSION

Defendants' Motion to Dismiss is **GRANTED** and Plaintiff's Motion to for Leave is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this _6_ day of August, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE